*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WENZLICK, Minor.

UNPUBLISHED
June 6, 2019

No. 345480
Ingham Probate Court
LC No. 18-000724-GM

Before: SWARTZLE, P.J., and M. J. KELLY and TUKEL, JJ.

PER CURIAM.

Appellant, Toni Ledesma ("Ledesma"), appeals by right from an order appointing appellee, Corey M. Coleman ("Coleman"), to be the permanent guardian of LMW, a minor child. We affirm.

## I. FACTUAL BACKGROUND

LMW was born in May 2015. Both of LMW's parents are now deceased, with the father dying in 2016, and the mother dying on May 27, 2018. Before the mother died, she was living in Eaton County with Coleman, her fiancé, as well as the infant son they had together, plus LMW. On May 29, 2018, Coleman filed a petition for guardianship of LMW in the Eaton Probate Court. On May 30, 2018, Ledesma, LMW's paternal grandmother, filed a petition for guardianship in Ingham Probate Court. She apparently had been taking care of LMW while LMW's mother was in the hospital, and LMW was physically with Ledesma when she filed the petition. At some point, the Eaton Probate Court transferred Coleman's petition to the Ingham Probate Court.[1]

The interested persons named on Ledesma's petition included Rebecca Olger, LMW's maternal grandmother, but Coleman was not listed. Ledesma listed herself and LMW's mother as the persons who had the care and custody of the minor for the preceding 63 days. Ledesma

---

[1] MCL 700.5211 provides that "[t]he venue for a guardianship proceeding for a minor is in the place where the minor resides or is present at the time the proceeding is commenced."

recommended herself as the proposed guardian and on May 31, 2018, after an apparently brief investigation, she was appointed temporary guardian by the Ingham Probate Court. Ledesma then filed a notice of hearing, scheduling a hearing on the permanent guardianship for June 29, 2018. Coleman was not officially notified. On June 13, 2018, Olger filed a counter-petition requesting that she be appointed guardian.[2] On July 2, 2018, Ledesma filed a response, denying that Olger was fit to be guardian and suggesting that Olger's intention was "to give the child to Corey Coleman, who is not a relative, so that the child can be raised with her half brother."

The court thereafter appointed an investigator. The investigator reported that Olger had admitted that her intention was to transfer care and custody of LMW to Coleman. He recommended that guardianship of the minor child be granted to Ledesma.

At a subsequent hearing on the guardianship petitions, Olger testified that since LMW's birth, she had watched LMW whenever the mother needed a babysitter. She testified that she watched LMW every day while the mother worked and that after her grandson was born and after the mother stopped working outside the home, she sporadically watched both children. She considered herself a primary caregiver along with the mother. She acknowledged that she thought the "best place" for LMW was with Coleman because of LMW's emotional bond with Coleman and because of her half-brother. Olger noted that she lived down the street from Coleman and that his parents lived across the street from him, so if she became guardian, it would be easy for all of them to visit LMW at her home.

Coleman testified that sometime between the time of the mother's death and the date that Ledesma filed her guardianship petition, he twice told Ledesma that he was going to pursue a guardianship. Coleman testified that he was working at a bakery, that he had typically worked from 4:00 a.m. to noon when the mother was alive, and that Olger would come over around 7:00 a.m. to watch LMW and the infant until he returned around noon. On most days, Coleman was the children's primary caregiver after noon. Coleman testified that after the mother's death, his parents and Olger would take turns babysitting while he was at work.

Coleman noted that the mother went to a methadone clinic for opioid addiction treatment and that after the baby was born, she began abusing alcohol. Just before her death from alcoholic pancreatitis, she was drinking between a pint and a fifth of alcohol every day. She did much of her drinking at night after he and the children went to bed. He denied enabling the mother's drinking, although he admitted to purchasing alcohol for her on occasion.

Coleman testified that he did not use drugs or drink, although he had drunk occasionally in the past. He acknowledged that, while the children were with their grandparents, he was intoxicated and stepped out into the street in front of a moving car. Although he was not struck by the car, he was admitted to a hospital because his fiancée, LMW's mother, thought it was a suicide attempt. The hospital diagnosed him with an "anxiety attack." At the hearing, Coleman

---

[2] Olger's petition did name Coleman as an interested person.

denied that it was a suicide attempt and cited this incident as the reason that he no longer drinks alcohol.

Following all of the testimony, the court stated that it was tasked with appointing a guardian who would act in LMW's best interests, and it referenced the best-interest factors of the Child Custody Act, MCL 722.23. The court appointed Coleman as LMW's guardian, noting his bond with LMW and the importance of maintaining stability in her life. The court had some reservations about Coleman's well-being but believed it was in LMW's overall best interests for Coleman to be her guardian because it would provide stability and continuity in the home life to which she had been accustomed. The court further stated that it would be "catastrophic" to take the minor child away from her younger sibling.

On July 23, 2018, the court entered an order appointing Coleman as the minor child's guardian, and Coleman signed an acceptance of appointment. On July 24, 2018, venue was changed to Eaton County "for the convenience of the parties" due to the fact that Coleman and the minor child lived in Eaton County. On August 6, 2018, Ledesma filed a motion for reconsideration in Eaton County claiming, in part, that it was error to appoint Coleman as guardian because no petition to appoint him as guardian was on file. She also indicated that she would have raised issues with his appointment if she had known that his appointment was a possibility. However, the court noted that Coleman's Eaton County petition had been transferred to Ingham County and concluded that the appointment of Coleman was sound, regardless. The court noted that the guardianship could be revisited at a later date if there was a change in circumstances or another reason to do so.

## II. ANALYSIS

### A. DENIAL OF DUE PROCESS

On appeal, Ledesma claims that she was denied due process because she was not served with a copy of Coleman's Eaton County petition for guardianship. She claims that the lack of notice of his petition prejudiced her because had she known that Coleman could possibly have been named as guardian, she would have questioned Coleman more thoroughly. While Ledesma raised this issue in a motion for reconsideration, issues raised for the first time in a motion for reconsideration are not preserved for appellate review. *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009). Thus, our review of this unpreserved constitutional issue is for plain error affecting substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011).

At the outset, we note that Ledesma's position is based on a faulty premise. The Ingham Probate Court did *not* rule on or otherwise consider Coleman's petition—it ruled on Ledesma's

and Olger's petitions—so the lack of notice of Coleman's petition is inconsequential.[3] MCL 700.5213(1) requires "notice of the time and place of *hearing of a petition*." (Emphasis added.) This is consistent with MCR 5.102, which requires "notice of *hearing* for all matters requiring notification of interested persons." (Emphasis added.) Consequently, because Coleman's petition *was not the subject of any hearing*, no notice of his petition was required. Ledesma cites no authority for the proposition that a guardianship petition (or any petition) that is not the subject of a hearing nevertheless must be served on interested parties.

Ledesma's position boils down to a claim that she was unduly prejudiced because if she had known that there was a possibility of Coleman being named guardian, she would have proffered other evidence, which ostensibly would have shown that Coleman was not the best choice to be LMW's guardian. Ledesma's position, however, is not supported by the record.

First, Coleman testified that shortly after the mother's death he told Ledesma that he was planning to file guardianship paperwork. He testified that Ledesma did not raise any concerns and did not object. He testified that he again told Ledesma when the paperwork was ready and that he was about to file it. Thus, there is evidence that Ledesma had actual knowledge of Coleman's desire to be appointed guardian. Second, in Ledesma's July 2, 2018 response to Olger's June 13, 2018 petition for guardianship, Ledesma stated that, in her view, Olger's ultimate desire in seeking guardianship was "to give the child to Corey Coleman, who is not a relative, so that the child can be raised with her half-brother." Since Ledesma admittedly understood Olger's pleading to mean that Coleman might obtain de facto custody of the minor child, she was aware as early as June 13, 2018, that Coleman's status and involvement in the minor child's life might be a consideration in the guardianship proceedings. She understood that if Olger were to be appointed guardian, Olger could attempt to transfer physical custody to Coleman. Thus, Ledesma was fully aware that if she had evidence to establish that Coleman having care over LMW was not in the child's best interests, she should present that evidence. Furthermore, her counsel cross-examined Coleman at the guardianship hearing, and during closing argument, Ledesma's counsel pointed out supposed deficiencies with both Olger *and* Coleman. Clearly, there was no purpose in counsel questioning Coleman's fitness unless counsel thought that Coleman could end up being responsible for LMW. Thus, the fact that counsel addressed Coleman's capacity to care for LMW again shows that counsel was fully aware that Coleman's status was pertinent.

We also note that the probate court's choice of a guardian is not limited to a petitioner. MCL 700.5212 states that "[t]he court may appoint as guardian a person *whose appointment serves the minor's welfare*, including a professional guardian described in [MCL 700.5106]." (Emphasis added.) Further, MCL 700.5213(2) provides that if the petition for the appointment of a guardian is deficient, including that the minor's welfare would not be served by the requested appointment, "the court may dismiss the proceeding or *make another disposition of the*

---

[3] The Ingham court only acknowledged having these "two different petitions" from the "paternal grandmother and the maternal grandmother," and later called the grandmothers "the two petitioners" and Coleman "a third party."

-4-

*matter that will serve the minor's welfare.*" (Emphasis added.) Nowhere in the statute does it limit the pool of possible guardian appointees to a petitioner, and Ledesma does not identify any authority saying otherwise. Thus, the court has discretion to choose someone other than one of the petitioners themselves. And this makes sense, as the purpose of the guardianship statutes is to "promot[e] the best interests of children," *Deschaine v St Germain*, 256 Mich App 665, 671 n 9; 671 NW2d 79 (2003), and arbitrarily limiting who can be appointed as guardian to certain people, i.e., petitioners, does not further this purpose.


### B. APPOINTMENT OF COLEMAN AS GUARDIAN

Ledesma also claims that the trial court substantively erred in appointing Coleman as LMW's permanent legal guardian. We disagree.

This Court reviews for an abuse of discretion a probate court's dispositional ruling on an appointment of a guardian and reviews for clear error the factual findings underlying the probate court's decision. *In re Bibi Guardianship*, 315 Mich App 323, 328-329; 890 NW2d 387 (2016). A probate court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes. *Id*. at 329. A probate court's finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding. *Id*.

The Estates and Protected Individuals Code (EPIC), MCL 700.5201 *et seq*., governs the guardianship of minors. See 1998 PA 386. As noted above, the statute providing for the appointment of a guardian, MCL 700.5212, states that the court may appoint "a person whose appointment serves the minor's welfare." The statute does not describe the method a court should take in determining whether an appointment would serve the minor's welfare, but the phrase "serves the minor's welfare" appears to be sufficiently synonymous with "best interests of the minor." Cf. *Deschaine*, 256 Mich App at 671 n 9 (stating that purpose of the guardianship statute is consistent with the Child Custody Act and is to "promot[e] the best interests of children").

Here, the probate court considered the best-interest factors of the Child Custody Act, which are outlined in MCL 722.23. The parties do not contend that this was improper. Indeed, these same best-interest factors are codified in EPIC under MCL 700.5101 and are applicable for "parts 1 to 4" of article V; and part 2 of article V covers guardians of minors. See 1998 PA 386; MCL 700.5201 *et seq*.

The probate court found that the best interests of LMW were served by Coleman being named her guardian. The court noted that LMW was only three years old and had lived with Coleman and her mother for the two years prior to the mother passing away. Thus, the court found that LMW naturally looked to Coleman as a father figure and had an associated bond with him. See MCL 700.5101(a)(*i*) (factor involving emotional ties to child). The court also noted that Coleman had exhibited "a good capacity and disposition to provide for [LMW]." See MCL 700.5101(a)(*ii*) and (*iii*) (factors involving capacity and disposition to raise child). The court also found that because LMW had lived with Coleman for the previous two years, there was

stability in that environment. See MCL 700.5101(a)(*iv*) and (*v*) (factors regarding length of time the child has lived in a stable, satisfactory environment and the permanence, as a family unit, of the existing and proposed custodial home). The court again stressed that LMW has already lost her mother, her father, and the only other parental figure she has is Coleman, and the court did not want her to lose that as well. See MCL 700.5101(a)(*i*) and (*v*). Finally, the court noted that Coleman and LMW's mother had a child together, LMW's step-sibling. The court found that if LMW were placed with anyone but Coleman, she would be subjected to not being with her younger sibling, which the court categorized as "a complete catastrophic event." See MCL 700.5101(a)(*v*) and (*l*).[4]

Ledesma, on appeal, does not take issue with any of these findings, except to allege that Coleman did not help with LMW's mother's substance-abuse problem and, in fact, had enabled her addiction to alcohol. Ledesma also points out that Coleman, himself, got drunk and was admitted to a hospital as a result of his intentionally stepping in front of an oncoming vehicle.

However, the court acknowledged and considered all of these facts. The court did find that Coleman had enabled LMW to have alcohol. The court also acknowledged that Coleman did get drunk one time "and apparently stumbled out in front of a vehicle." But the court noted that there was nothing definitive to show that this was a suicide attempt. In all, the court found the incident "unremarkable." Based on our review of the record, the court's findings for these matters were not clearly erroneous. Coleman testified that while others perceived this incident with the car as a suicide attempt, he denied that was his intention. Moreover, Coleman stated that this incident was a catalyst to make him stop drinking.

We conclude that, on balance, the probate court's finding that the appointment of Coleman as guardian of LMW was in LMW's best interests was not clearly erroneous. While there were some concerns with Coleman, the court considered them and still determined that the overall best interests were satisfied. The court clearly gave a great amount of weight to preserving some sense of stability, permanence, and familial bond with LMW after she had lost both her parents. See *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008) (stating that a "trial court has discretion to accord differing weight to the best-interest factors"). We perceive no clear error. Accordingly, the court did not abuse its discretion in appointing Coleman as LMW's guardian.

---

[4] While the court connected this fact with the catch-all best-interest factor described in MCL 722.23(*l*) and MCL 700.5101(a)(*xii*) ("Any other factor considered by the court to be relevant to a particular dispute regarding termination of a guardianship, removal of a guardian, or parenting time."), it would seem to apply to MCL 700.5101(a)(*iv*) (length of time the child has lived in a stable, environment) and (*v*) (permanence, as a family unit) as well.

Affirmed.

/s/ Brock A. Swartzle
/s/ Michael J. Kelly
/s/ Jonathan Tukel